With the attorneys who are going to make a presentation this morning, please approach the podium, state your name and the party you represent. Good morning. My name is Tom Needham, N-E-E-D-H-A-M. I'm with my colleague Lauren Cannizzaro. She's from my firm. We represent the plaintiffs and the appellants in this case, Luis Contreras and Susana La Casa Caliz. Good morning. Jonathan Byer, B-Y-R-E-R, for the city of Chicago, representing the superintendent. Okay. We have a full schedule this morning. We have allotted 30 minutes for this case. That time will be divided equally, each side having 15 minutes. Mr. Needham, you can reserve some time for rebuttal if you like. And with that, you can proceed. You go first. I would like to just reserve, if I could, three minutes for rebuttal. All right. And may it please this honorable court, thank you for the opportunity to address the court on behalf of both of my clients in this case. I want to acknowledge, as I did in my brief, and both of my clients understand, the deferential standard of review that is applied in this case. Administrative review law, which is the avenue by which my clients brought this case to the circuit court and then here, has built right into it language. It says that there's a prima facie presumption of correctness of factual findings. And yet, the courts also sometimes, on rare cases, but in appropriate cases, will reverse a case where they find that if it's against the manifest way to the evidence, meaning when the opposite conclusion is clearly evident, the courts will right a wrong. And while courts are not supposed to reweigh the evidence, they do determine whether the decision of the administrative body is just and reasonable in light of the evidence presented. So we understand all that. And there's no quarrel here about the burden or the standard of review. This is one of those cases where the court should take a close look at this evidence and decide that the opposite conclusion is clearly evident in this case. The case at the police board is based on an incident that happened on March 19, 2011, when two Chicago police officers responded to a scene where there was already another police officer and his partner taking some police action for detaining or handcuffing four individuals for suspicion of something we're not exactly sure about. But nobody committed any crimes or was arrested in this case for reasons that are not clear in the record. A decision was made to let three of those individuals, their handcuffs were taken off, go on their own way. But another individual, a teenager, it was decided by the officers that he would be taken back to his home. So my two clients, Contreras and La Casa Caliz, then took the young man into their vehicle, not handcuffed, not in custody, free to leave at any time according to the uncontradicted evidence in the record, and drove him from 3500 McLean to 1649 North Spaulding. It's about a five or six block drive, takes several minutes, it's almost straight south. The decision to go to that particular address was not something made up by either one of my clients. It didn't come out of thin air. They got that address from Officer Edens, the original officer who stopped the young man and the other people and handcuffed them. He told them that, he told my clients according to the record here, that the young man lived at 1649 North Spaulding even though Edens testified that he had filled out a contact card, a small little index size card, with the young man's address. Prior to that exchange, according to the board's findings, the Contreras suggested, without knowing this young man, suggested that he lived at 1649 North Spaulding. The young man lived in an area near Le Moyne, which belonged to the opposite gang that he was in. And there's other testimony before the board that Contreras was well aware of gang signs and gang colors, and he would be aware that this was a... But Contreras did not know the young man. I'm not using his name now, although it's in the record, but I don't know his age right now. But it's undisputed that Contreras did not know that person. Contreras denied that he was a participant in that conversation with Officer Edens, which gets to what I think is the most troubling... Well, the board made a credibility finding and decided that's what happened, and aren't we bound by that? Here's what they did. If I can just suggest a chronology to the court. They did. They said they believed Officer Edens. This incident happened on March 19, 2011. Several days later, Edens is confronted in the 14th District parking lot by Officer La Casa Caliz, who's been stripped of her police duties. Edens acknowledges this, and she goes up to him and says, Why did you tell us to take this person to 1649 North Spaulding? Well, why didn't she do that the day the incident was taped? In other words, she takes him to an address where people are running around the car. Right. Obviously wrong. Why didn't she, with righteous indignation, drive back to the scene and say, Officer, why did you send us here? Why does she wait until after the stuff hit the fan before she does this? Well, I mean, from what I can tell on the record, the YouTube video was posted right away. I don't know why she didn't do that. There's no answer to that question in the record, to be honest with you, Justice House. But, you know, I would be more persuaded if there's evidence she, at that moment, said, Why did you send me to this address, which was phony? Rather than wait until after it's troubled, because then it almost seems like she's trying to cover. If she had done it the day, the day of, and said, Why did you send me to this address? Well, she does it, and there's evidence in the record, she does it the first time she sees this officer after her professional life has been thrown into turmoil. That's what she does. She confronts him. Counsel, I'm a little more troubled by why she directs the young man while he's seated in the car, and she's inquired as to whether he lives there. The answer is no. And she commands or directs him to take his hands from his face. Because there's people around, and according to her, she's trying to determine, does he live there? She's relying on the information. The House says no. Sorry. I'm sorry. That's okay. Why would you ask these strangers if they live there, when you can ask the person who's in the house and the individual, do you live here? Right. And that's what she did. I understand the record to be that she asked the person in the house after she opened the car door. Maybe that's not the case. Well, within 15 seconds, she knew he didn't live there. Right. And then they're there for about, according to this video, it's about 90 seconds long, and then they drive him back to the house. But he's not even getting out of the car. Right. So can't you just discern that if he's not getting out of the car, you allegedly stopped in front of the address giving to you where he lives. He's not making any motion to get out of the car. He obviously doesn't want to be there. And he's still there? There's no doubt that he didn't live there. She didn't know that when she drove him there. The charges against these officers are that they took him there and committed the crime of unlawful restraint, that they took him there for the purpose of making sure that he was embarrassed or made fun of or threatened or humiliated. But when they went there, they did this because this is what Officer Edens told them to do. We know now because at that hearing, Officer Edens said that this was a joke. When this incident happened on March 19, 2011, Edens was interviewed by the Internal Affairs Division on April 12, 2011, about three weeks later. He mentions nothing about this joke about going to the address on Spaulding. Both of the police officers were interviewed shortly thereafter on April 18, 2011. And then Edens is brought back for a second interview at the Internal Affairs Division. And, again, he doesn't mention anything to the Internal Affairs Division, according to the official record that was presented to the superintendent when he made the decision to file the charges at the board. But at the hearing, he says, I was just joking, and this was all a joke. They must not have gotten my joke or understood it. And when he's asked by one of the officer's attorneys, well, did you tell the Internal Affairs Division about this joke that you had with Officer Contreras? He answers, yes. And the attorney says, you did? And he says, yes. And then he goes on to say something that should trouble anyone who's in the court system or who cares about a system that is designed to seek the truth. And this is at page 121 of the report of proceedings, and it's page 124 of the February 6, 2013 police board hearing, when he's asked about why is this not in your statement. He goes on for about a paragraph, and he basically says, when he was asked that question, at the conclusion, is there anything else you want to add? He says, I looked over to my lawyer, and that's when she asked the detective if we can talk off the record for a moment. And he pretty much said, okay. And then he goes on to say, I'm not going to put anything else in there, saying that I made a joke, to make it easier for them, since they pretty much told I.A.D. that I told them to do this, which I did not. And so this comes out at the police board hearing when the superintendent's already made his decision. And where I practice most of my cases is in the criminal court, and if this kind of thing came up in a criminal trial, there would be a mistrial. Everyone would be screaming and saying this is a blatant violation of Brady v. Maryland. If this came up in a civil proceeding or a trial, some witness said that in an earlier statement or a deposition that they omitted some fact because they had an off-the-record conversation with whoever was the questioner, it would be contemptuous and sanctionable conduct. And so when you're saying, Justice Hollison, it's true. The police board did decide to believe Officer Eden's. His testimony was utterly unworthy of belief once he admitted that he's withholding information from the Internal Affairs Division, which then moves the case to the superintendent's office. Even accepting that Eden's testimony is unworthy of belief, don't we yet have the conduct of the officers? You have a videotape which shows as one of the dissenters on the police board said that they managed the situation with professionalism. They were there for a brief period of time. Nobody was hurt. They went there. And by the way, this is a fact that I think is important. If it's true, the superintendent's theory in this case, that they went there so that they could threaten this person or in some kind of bizarre effort to what? Scared straight. Yeah, I guess if that's the theory, why would they then when they get there, why would Officer LaCasse-Culise approach someone and ask if he lived there? That kind of makes no sense if you're doing that to do the scared straight thing. As you said, Justice, why would you then approach a citizen? There's a couple that's out in front fixing their fence. They weren't called as witnesses, but their daughter was and told the board what she understood happened. And that's what Officer LaCasse-Culise says. And at the same time, at approximately 27 to 30 seconds of this 90-second videotape, according to Officer Contreras' testimony, and there's a lot of noise and it's hard to hear, but if you take the time to listen to it, you can see that it's true what Contreras said, that he's asking the people there, does he live there, does he live there. So both of these officers are in different ways trying to find out if the guy lives there. Isn't that being perceived as really just drawing attention to him, though? Because, I mean, he's still sitting in the car and he's not unable to speak. He's shielding his face. Well, both officers said they had no conversation with this young man when they're taking him from the address. So not that they couldn't, that they didn't. Because they didn't know that Officer Edens had some weird joke in his mind about taking him over to a different neighbor. Neither one of these officers knew this young man. That evidence is undisputed. Counsel, what do you do with the statement that Edens testified to? Justice House referred to it at the beginning of this argument, where Edens claims that Contreras first brought up the issue, hey, let's take him to Lemoyne and Spalding. Do we have to take that as true? No. You can presume it's true, it's prima facie correct, but when you look at the entire record here and you have an officer that says, when he's giving a statement to the Fraternal Affairs Division, for two of his fellow officers that have their careers hanging by a thread, he goes off the record and says, this is all a joke, but don't put that in the statement because I don't want to do anything that's going to help these people. Is anything that that person says, that officer says, worthy of anyone's belief once he admits that he's engaged in that kind of conduct? Apparently in collusion with Detective Morris, who wasn't called by the superintendent in this case. So I think that that by itself gives this court ample basis to say that the opposite conclusion in this case was clearly evident. There's other factors I want to point to here before I give my colleagues some time and sit down. In this case where the superintendent has the burden of proof, a decision was made not to call the young man who could have contradicted the officers when they say they had no reason to believe he didn't live on Spaulding. That was not done. There's a police officer that was with Officer Edens who may shed light on whether or not this was a joke or what was said there. A police officer whose name is Sweeney, whose first name is not known on the record. That person was not called by the party with the burden of proof. There's a woman who they called as a witness. I think her name is Merlin or Marilyn Vergara. Her parents were the ones that actually spoke to Officer LaCasse-Cullese. They weren't called. Instead, a family member was called, a daughter, who didn't even hear the conversation. The contact card which would have Officer Edens' handwriting of where this young man lives was, according to the police board, the police board said it, quote, mysteriously disappeared, even though there's two others that are found in this case. A final fact I want to point out that's missing from the record that should be considered is an inference against the party with the burden of proof. Both of these officers, Contreras and LaCasse-Cullese, are accused of violating the police department's Rule 14, which prohibits false statements to the Internal Affairs Division. We know that the Internal Affairs Division types up a transcript of these statements, and neither one of these two officers' statements, which were both taken on the same day, April 18, 2011, were presented as part of the record. And yet the board is finding that the statements they made to the Internal Affairs Division were false. I'm going to save two or three minutes. Thank you. Okay. Thank you. Good morning. You may proceed. Good morning, and may it please the Court. This Court should affirm the police board's decision to discharge Contreras and LaCasse. The police board's core factual finding here, that Contreras and LaCasse took a teenage boy into rival gang territory for the purpose of terrorizing him, spent ten minutes there terrorizing him, is not against the manifesto. It is not a display of the evidence. To the contrary, that finding is directly supported not only by the eyewitness testimony of Ms. Vega, who testified to what she saw out her bedroom window when this incident occurred, but also by the undisputable video evidence showing LaCasse and Contreras standing idly by. What evidence do you have, Counsel, that they knew that the minor, the young man, I guess we don't want to use his name, was a member of the Imperial Gangsters? There was ample evidence on the record, a fair amount of testimony, that these officers were both well familiar with gangs, well familiar with how to identify gang members. Okay, but I'm talking about this particular individual. What I saw from the record, there was no evidence he was wearing gang colors. Is there any evidence in particular? Eden said he knew this individual to be a member. But is there any evidence that Contreras and LaCasse did? The evidence is, as is appropriate in these hearings, is circumstantial, is inferential from the record, but... Okay, what in the record allows us to draw that inference? Several things. Most notably is the testimony that Contreras initially suggested, this is the testimony of Officer Edens, that Contreras initially suggested that they take Mr. Castillo, the young man, into gang territory. And it's undisputed that it's well known throughout that precinct that the location that's falling in question was Latin King territory. And that's strong evidence. Why would that be... Why would that particular location be chosen in the first place? A fair, reasonable inference can be drawn from that to start, but also from the fact that when the officers got there, if they didn't believe that he... When the officers arrived at Spalding and opened the door and stood there, and that's clear from the video, that's undisputable from the video, that they stood there surrounded by individuals yelling quite clearly Latin King's slogans, making signs with their hands that were identified even by the officers' former partners. That was clearly a gang sign. Again, a reasonable inference can be drawn from that, that they were aware that, even if they weren't aware that Castillo was specifically from the imperial gangsters, that's an inference that they knew he was not a Latin King, that he was not a person who would be welcome in that neighborhood. Otherwise, why would they have done that? Why would they have exposed him to this particular group of gangsters for this amount of time? I'm not following you. How does that show that they knew he was not a Latin King? Well, if he was a Latin King, why would the gang members be taunting and be threatening to gang-bang him? Okay, but that's something that happened once they got there and once they opened the door. They drive to this address. They drive to a very specific address. When they pull up to that address, there's no Latin Kings running around at that moment, right? I actually don't believe that's correct. Ms. Vega testified that almost immediately when they arrived there, Latin King members exited their homes and proceeded to the vehicle. Okay. What I took from it was that it was after the conversation with Vega's mother in La Casa, but there's probably some overlap between those two things. But when they first pull up, they're not pulling up onto a spot, to a location, where there's a bunch of people already congregated, right? From what I can tell from Ms. Vega's testimony, it was that they came out of their homes. It's not clear she was being precise on that, if they were near their homes. I don't think that level of precision. But she said that individuals ran out from all directions to come towards the car. Right. Which also can be, I think, a fair way to be drawn from that, that those individuals may well have recognized Mr. Castillo as a rival gang member. No, he may have been a rival gang member. What I'm getting at is at the time that he got into the car at 3500 West and McLean, how do we know that Contreras and La Casa both said they did not know who this person was. They didn't know his name. He wasn't wearing gang colors. They didn't know that he was an imperial gangster. I understand that you would attack their credibility. I understand that. Yes, and the board rejected their credibility. I understand that. But, you know, we still need some evidence in the record that they knew that. So you would point to the comment that Contreras made at the beginning. Not just the comment. Sorry, I left out what I believe is a crucial point. It's not just the comment. Everybody was aware of what this initial call to Officer Edens and then Contreras and La Casa were responding to. It was a report of gang activity. And I think that's crucial. Again, as we know in our brief, all reasonable inferences have to be drawn in favor of the findings below on administrative review based on that fact that they knew they were a gang. How does that make him an imperial gangster? I mean, he could have been a gang member, but how do we know he was an imperial gangster? I mean, he was only five blocks from where he got dropped off. It's not like he was being driven from, you know, the south side of Chicago to, you know, someplace on the north side of Chicago. How do we know that they knew that he was an imperial gangster? Well, I don't think it's necessary that they knew he was an imperial gangster. I think it's important that they know that he was not a Latin king. And I think that is particularly a strong inference based on... At 3500 West McLean? Yes. That they knew that? Yes. Based, again, on the fact that they immediately suggested Spalding as a location known to everybody. I believe that's undisputed. That's well-known Latin king territory. I don't believe there's any dispute there. And there's testimony that they were a welfare gang, so they knew how to identify gang members, their colors, their signs, all the various things that you would expect a police officer in their position to know given the kind of beat that they were working. Then they took him there. And, again, the most crucial was what they did when they got there. They said, counsel concedes in his brief, that they immediately learned that, unsurprisingly, Castillo did not live at Spalding. That should have been the end of the matter. But they should have left. They had a radio. They could have contacted Edens and found out, hey, did we misunderstand you? Was there some miscommunication? If they really believed that Officer Edens had sent them there, they were well aware of the contact card requirement that Officer Edens would have filled out a contact card, would have known where they were. I'm sure these miscommunications happen inadvertently all the time. A number gets transposed, things of that sort. Could have contacted and said, didn't you tell us Spalding? Are we in the wrong place? But they don't claim they did that. They stood there next to the car while Latin kings tormented Mr. Castillo. Let me ask you this. How much time really transpired during this? I mean, there was talk of ten minutes. I'm not sure that that's actually supported by the record. But let's go through a little rundown of this. Vegas says the initial discussion between La Casa and her mother was a minute. La Casa said it was about 15 seconds. But Vegas said it was a minute. And the board likes her testimony a lot. So they found her credible, yes. So that's a minute. And then she said within a couple minutes after that, the video started, which is 90 seconds. Now, at the end of that video, it seems to me like the show is over, if there is a show. It seems to me like everyone is walking away at the end of that video. So maybe you disagree. But I see, you know, I mean, the video only gives us a glimpse. We don't see everything. But what we do see in the video, everyone is walking away. It's dispersing. So when I do my math, I get closer to five minutes. And I get the interaction with the gang members running in to be more like two, two and a half minutes, something like that. I'm not saying that's an insubstantial amount of time. But don't we have to take a look at how long this happened? It wasn't as if they paraded this gentleman for, you know, 10 or 15 or 20 minutes or something. Well, again, because this is an administrative review and because factual findings must be taken as true unless they are against the manifest. I understand. I'm just trying to get a chronology of this. Correct. There is Ms. Vega, who the board, again, found credible, and who there is no dispute regarding her credibility. There is no attack that she had a motive. It was actually extraordinary that she appeared given what she was saying about a local gang. That was actually kind of astounding. And, again, it explains, as counsel, why the parents didn't come, and why they weren't at the hearing as well. She testified 10 minutes, and the video didn't have to start immediately. Even if the video was short, I believe it was approximately 90 seconds. I'm not quite sure. I didn't count the time exactly. But they didn't have to start the video immediately. We don't know what happened in the time. From the video, we don't know how long it had been before someone pulled out a camera and started recording. We knew individuals, as Vega testified, immediately began photographing and videoing. We just have this one video that someone posted to YouTube and then became available to everyone else. So, again, because of the nature of administrative review, I think we're bound to conclude that there's no basis to reject the 10-minute length. Okay, let me ask you this. Eden said he was joking when he gave the address on 1600 Blocks North of Spalding. Yes. Is that what you would ask us to find, that he was joking? That's what I believe the board found as well. I'm not asking this court to make factual findings. Well, no, I understand that. And the board believed that Contreras was in on the joke. I'm not quite sure if I would say that he was in on the joke. Let me really start over. That Contreras suggested in the first place where they go. So I don't believe that Contreras was joking. Eden immediately thought, from his testimony, as I gather, he thought this was absurd. Why would they take him there? Oh, we're just joking around. That makes no sense. I think Eden's belief Contreras was joking, but I don't think the board didn't find that Contreras was joking. Okay, but I guess what I'm wondering is why did they drive him to that address? Why did they drive him to 1649 North Spalding? Why didn't they drive him to Le Moyne in Spalding, which is apparently what Contreras initially brought him? Or why didn't they drive him to a place where there were a bunch of gang members congregated, obviously congregated, and just pull up and open the door? Why did they go to that address? If they didn't think it was true. Well, I think that's something for Mr. Contreras. He was the one who suggested that address in the first place. No, he didn't suggest 1649 Spalding. That was Eden's. But he suggested Spalding and Le Moyne, I believe, which I believe is, if my recollection is correct, is that vicinity. That's the same. Yeah, it's on North Avenue, I think. It's 1500 North. But why go to that address? That's something I'm having trouble understanding. If it was a joke and if he knew it. I mean, either he knew it was a joke or he didn't. If he thought it was a joke, why did he go there? I believe it was because that's where he intended to go regardless of what Officer Edens said. Officer Edens believed it was a joke. He played along believing it was a joke. There was no reason to take him there. Officer Edens said, I know he wasn't from there. I thought it was a contact card. And also that's Latin King's territory. Why would they take him there? So I believe that was where they intended to go anyway. That Officer Edens, believing he was playing along with a joke, suggested an address didn't affect things. The course had already been set when Officer Contreras decided he was going to pick up Mr. Castillo and drive him to Spalding. Officer Edens didn't affect that. He got in the mix of that, but he didn't change that. That course was set. Contreras and La Casa were going to Spalding. Was the course set with Contreras and La Casa? I mean, we have on the video at least Contreras when he's on the scene or at the address actually inquiring or making a statement that, hey, this young man says he lives here. And on the other hand, we have La Casa who's making an inquiry as to whether or not the individual lives there. So how is it that the board concludes that or if they conclude that La Casa and Contreras are both in on this? It would seem to me that there might be some support for finding that La Casa maybe isn't in on the game or the joke, whereas Contreras, who makes earlier statements and then on the scene kind of like, I don't know, even in a taunting way says, hey, this guy says he lives here. That's a little different from saying, hey, does this guy live here? I don't think there's any basis to find, again, given the manifest way that the evidence stand in our review here, I don't believe there's anything that this court could find that a finding that La Casa was in on this, that she intended to participate in this. I don't think any finding that that was against the manifest way of evidence could stand based on the video. Listening to that video, these officers are claiming that they're trying to figure out where Mr. Castillo lives. Officer La Casa claims that she's trying to figure out where he lives. But there's absolutely nothing on the video that supports that. Listening to that video time and time again, there's nothing where the officers are trying to inquire, where does he live, can you tell us where he lives, why would anybody tell us where he lives? They stand there. And the only time that Officer La Casa speaks up is to tell Mr. Castillo to put his blank hands down. That's totally inconsistent with trying to figure out where he lives. Even more inconsistent is the fact that the officers admit they never asked Mr. Castillo where he lived. That would seem a basic question to ask. But you would agree if they thought he lived at 1649 Spalding, they would have no reason to ask. If the person who filled out their contact card gave them that address and they believed it. I know you don't think they believed it, but hypothetically if they believed that, why would they have to have a conversation with Mr. Castillo about where he lives? They've already been told by Edens. Well, the problem with that is that there is obviously a point when they could not have believed he lived there. Again, they admit they immediately confirmed that Mr. Castillo did not live there. But they never asked Mr. Castillo where he lived. In fact, they just eventually went and took him back to where they found him, back on the claim. They claimed that they tried to engage him afterwards, but he wouldn't speak with them. I think Picasso said they tried to talk to him afterwards, after they'd left the scene, but he wouldn't tell them. So they said, well, we'll just take him to where. I don't recall such testimony. I'm sorry. No, that's fine. But my understanding was that they admitted they didn't ask Mr. Castillo where he lived. And that would be, I believe, would be anybody's first response, if they were seriously intending to take him home when they got to the scene and a resident that they had no reason to disbelieve, Ms. Vega's parents, said, no, he's not from around here. They stayed. They didn't ask him where he lived. And they opened the door to the car. They opened the door to the car. They opened the door to the car so that Vega's mother could see him in the car, right? That's what I understood. I do not believe that finds any support in this record. You think the car door opened after all the gangbangers converged? I'm not sure. I don't know why the car didn't open. Maybe I need to read the record. But as can be seen on the video, they're standing there, just standing there, with these individuals around who are calling, who are using epithets against Mr. Castillo, who one individual threatens to gangbang him. Everybody's yelling various King slogans, making King signs. And then Mr. Contreras taps La Casa on the arm and then walks right to the other side of the car and opens the door facing into the street. And a group of kings runs around to that side of the car and continues taunting Mr. Castillo. That can't possibly be reconciled with the claim that they were trying to find out where he lived. Why did that door need to be opened? What was the point of that? How could anyone reasonably think that these individuals, who were clearly just taunting and tormenting Mr. Castillo, had any interest in ever providing information about where he lived? It would have taken two seconds to realize that that was not going to happen, close the door, and do something else. That's not what they did. And as the board pointed out in making its findings, even setting aside the supposed issues with Officer Eden's testimony, it's that video that is the undoing of Contreras and La Casa's entire case. That video, which is undisputable, shows what they really intended to do. Questions about jokes aside, questions about original intent aside, with this conversation with Officer Eden's, when they got there, they decided they were going to torment him. And that is, as the board recognized, is more than enough to justify the sanction of dismissal. Indeed, the board found that conduct in and of itself so troubling. That was the sole basis that it focused on when explaining why it chose discharge. It didn't discuss these other violations. It said this sort of conduct can inflame gang violence. And there's no dispute from Contreras and La Casa that this sort of conduct could have seriously inflamed gang tensions between rivals. Someone could have seen this as a slight against one of his comrades, against one of his friends, and who knows what could have happened. This is not the conduct that's becoming of an officer of the Chicago Police Department. And they focused on that video, which the board was quite clear was these officers undoing. And we would urge this court to find the second. Do you believe discharge is appropriate, even if the original intent to take him to that address was not to harass him? I believe so. I believe even if the, again, going completely contra to the board's findings here. The board found that they intended, their original intent was to take him there. Even if that intent changed at some point, that's still conduct wildly unbecoming of a Chicago police officer. How any police officer could find that exposing a young man to these sorts of taunts and threats from a gang, from a group of gang members, is possibly within the scope of their duties. No officer could possibly believe that. And we submit that there's no way that the board's finding that that conduct warranted discharge could be considered arbitrary or unreasonable or inconsistent with the needs of the service, which are the sole bases on which that sanction can be overturned. Just to briefly touch on a few points, if this panel has no other questions. Just regarding the individuals that weren't called to the police board hearing, Contreras and La Casa had in their power to call all these individuals as well, but they did not. For whatever reason, they believed it wasn't necessary. I don't believe any negative inference can be taken for not calling Mr. Castillo, who had been traumatized by this experience, or by not calling Vega's parents. Just no inference can be taken that this case should be, that this finding should be considered. Is there any evidence in the record as to why they didn't call Castillo? No, there is not. It's just silent across the board. But again, neither side called Mr. Castillo, at least to my knowledge from the record. One side had the burden of proof. That's correct. But the officers did call their own witnesses regarding their, they did testify on their own defense, obviously. They called their own witnesses. But it is a bit of a hole in the case, isn't it? It's a rather glaring omission in the case that the person who was transported probably could have either corroborated or frankly decimated the officer's testimony. Wasn't there? I don't believe it's a hole in the case. I believe that it could have provided additional evidence, but that doesn't change the fact that the evidence in the record supported the finding. And if these officers believed that these individuals would exonerate them, if they believed Mr. Castillo would say, oh, of course, the whole time they were saying they were going to take me to swallowing and I thought that was just fine and I just didn't speak up. But they didn't do that. So they saw no reason to call him. So I don't believe any inferences can be drawn against the verdict because inferences can be drawn in favor of the findings as well from that. So I believe it's an equipoint at the end of the day. What do you say to Mr. Needham's point that Officer Edens seemed to be a little less than forthcoming with internal affairs? I don't believe that's accurate at all because Officer Edens said at the close of the statement he was questioned about the incident and he said, I'd like to go off the record, but he disclosed. Hold on. Let me stop you there. As I read the record, Officer Edens was asked by IAD, did you order those officers to go to 1649 Spalding? And he said, no, I didn't. Correct. And then the interview proceeded. There was writing and then he wanted to confer with his lawyer and he came back and he said, I didn't order them to do it because I can't order them to do it. He was being rather technical with his words. He said, I'm saying rank. I can't order them. But I did tell it to him, but it was a joke. And then he said he didn't want to put that in his report. Do I have that all right? The general gist of that, yes, I don't want to vouch for exact wording. Nor do I. But I don't think that can be taken as Officer Edens trying to hide things. He disclosed it to the investigator and I don't believe that the investigator had an obligation during an investigation if an individual said, I want to keep this off the record, to just set aside material. That would be surprising if that were the case, that an officer could say, well, I want to keep this off the record just because I don't want to talk about it. That would completely undermine the entire procedure. But to me, that sounds like Officer Edens was being forthright and saying, you asked me this question, I answered the question truthfully, but I want to give the full story. And also, it's undisputed that one of the key arguments that Contreras and LaCosta make was that when they confronted Officer Edens, he said it was a joke. So even when he was confronted, he hasn't changed stories. He hasn't bounced back and forth. He was saying this from the very outset. I thought it was a joke then. When they talked to me, I thought it was a joke. Yeah, no, okay. I know we need to wrap up. What about LaCosta confronting Officer Edens afterwards in the parking lot? What do you say to that? Was that a ruse also? Sorry, what was that? Was that also a ruse, just like her question to beg his mother was a ruse? I believe that that was just outrage. How did this come about? But again, it doesn't undermine.  Why did you tell us to go to that address? Edens says, yeah, that's exactly what she said. I didn't see the board talk about that at all. I believe that's consistent with it just being a ruse, trying to build a story. The board found that Officer LaCosta was engaging in a pattern of trying to conceal what she did, found her testimony preposterous, in fact, and that seems consistent with that, with trying to build a story about why they were there. If there are no further questions, we respect all your requests that you affirm the decision of the police board in all respects. Thank you. Mr. Bader? Edens admitted at the police board that LaCosta confronted him and he said it was a joke. And then in two separate interviews at the Internal Affairs Division,  and he also never told the Internal Affairs Division that he had been confronted with LaCosta in the parking lot about this. But here's what he said at the police board. The reason for why he didn't do it, I don't understand the city's argument that there was some plausible or innocent explanation in light of what Edens said is that at the police board when he's under oath now, and he feels maybe more impelled to tell the truth, he says, I'm not going to put anything else in there saying that I made a joke to make it easier for them. And that is a complete, that's a scandal. It's not a large scandal but there's something fundamentally wrong with that and that's who the police board decided to believe. A final point on behalf of my two clients, please look at their records. If Contreras and LaCosta-Coliz are part of the joke, I don't understand what the joke is. They don't know this young man. And these are two people that have no disciplinary history, have a wealth of positive facts in their background and they come from the kind of backgrounds that we should welcome and encourage in the Chicago Police Department. Ms. LaCosta-Coliz lived in Spain until she was 25, has a psychology degree, worked as a social worker and a therapist for underprivileged or challenged children. Officer Contreras was born in Mexico City, moved here when he was a teenager with his family, has a college degree, worked as an armored car, armored bank driver. And there's a replete in the record, there's six witnesses that came forward and not the typical police witnesses that talk about how aggressive and active they are as police officers. These officers excelled at their job, living in the community that they were policing. And to see their careers ended on this point because of a joke from another officer who tried to hide the fact that there was a joke from the people who were making a decision about the case, that the opposite conclusion is clearly evident and there's a well-founded basis for this court to reverse the police board. So I'm imploring you on behalf of both of my clients to do exactly that. Thank you for your time today. Thank you. The case was well briefed and well argued, very interesting and stimulating case. The case will be taken under advisement and a decision will be issued in due course. Thank you very much.